1

2

3

4

5

6

7

8

9

10

11

12

13

14

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

WENDY HEALEY,

                    Plaintiff,

        v.

TRANS UNION LLC, et al.,

                 Defendants.

CASE NO. C09-0956JLR

ORDER ON MOTION FOR
SUMMARY JUDGMENT

15      This matter comes before the court on Defendant Debt Recovery Solutions, LLC's

16 ("DRS") motion for summary judgment (Dkt. # 55).[1]  Plaintiff Wendy Healey opposes

17 DRS's motion.  (Dkt. # 59.)  Having reviewed the parties' submissions, the balance of the

18 record, and the governing law, and having heard oral argument, the court GRANTS in

19 part and DENIES in part DRS's motion for summary judgment.

20

21       [1] Ms. Healey dismissed her claims against Defendant Trans Union LLC in October 2010.

22 (Dkt. # 43.)  At oral argument on May 18, 2011, Ms. Healey's counsel represented that she had
also settled her claims against Defendant Experian Information Solutions, Inc. ("Experian").

# I.   BACKGROUND

This case arises out of DRS's efforts to collect a debt that it purchased from Embarq (referred to by the parties as the "Sprint/Embarq account").[2]  The debt was based on a delinquent Sprint cellular telephone account that had been opened under the name "Wendy Healey" at a Tallahassee, Florida address in 2004.  Plaintiff Wendy Healey asserts that the delinquent account is not hers, that she has never had an account with Sprint or Embarq, and that she has never lived in Tallahassee, Florida.  (Healey Decl. (Dkt. # 61) ¶ 1.)

Beginning in 2005, Embarq assigned the debt to two prior collection agencies, both of which attempted to collect the debt on the Sprint/Embarq account from Ms. Healey.  (*Id.* ¶ 2.)  Ms. Healey successfully stopped both collection efforts.  (*Id.*)  On February 6, 2007, however, Ms. Healey received a letter from a third collection agency, DRS, demanding payment of $902.77 due on the Sprint/Embarq account.  (Felton Decl. (Dkt. # 56) Ex. C.)  The letter, which was addressed to Ms. Healey in Everett, Washington, stated that DRS had purchased the debt from Embarq and that the letter marked the beginning of its collection process.  (*Id.*)  The letter further informed Ms. Healey that DRS would assume the debt was valid unless Ms. Healey notified DRS within 30 days that she disputed the debt; and if DRS received timely notification of a dispute, within 30 days, it would obtain a verification of the debt and mail a copy to Ms. Healey.  (*Id.*)  Finally, the letter notified Ms. Healey that a negative credit report had been

---

[2] Neither Sprint nor Embarq are parties to this action.

submitted to a credit reporting agency.  (*Id.*)  Don Schwartz, chief operating officer of DRS, testified that DRS did not submit the negative credit report—rather, the negative credit report had been submitted by some other entity before DRS purchased the account. (Felton Decl. Ex. B ("Schwartz Dep.") at 24-26.)  The record does not reflect who submitted the negative credit report prior to DRS's involvement.

On March 1, 2007, Ms. Healey sent DRS a letter titled "Request for Debt Validation."  (Felton Decl. Ex. E at HEALEY 000938.)  In her letter, Ms. Healey stated that that she was "disputing this collection account as I have never had an account with Embarq."  (*Id.*)  Ms. Healey did not describe her past efforts to delete the Sprint/Embarq account from her credit report or provide any other information about the account.  (*Id.*) Ms. Healey asked DRS to provide proof within 30 days that she was obligated to pay the debt, including the following items:

1. Agreement with your client that grants you the authority to collect this alleged debt.
2. Agreement that bears the signature of the alleged debtor wherein he/she agreed to pay the creditor.
3. A copy of the original application by this debtor—including the source of collateral used to gain this credit.
4. The complete payment history on this account so I have proof that the amount is correct.

(*Id.*) Ms. Healey's letter included an address in Arlington, Washington, because she had moved from Everett earlier that year.  (*Id.*)  On March 7, 2007, DRS noted in its records that the account was in dispute and that it had requested documents to verify the debt. (Felton Decl. Ex. D. ("Collection Notes") at DRS 0001.)

ORDER - 3

1        On May 3, 2007, Ms. Healey sent a follow-up letter to DRS in which she stated

2    that she had not received a response within 30 days as requested in her earlier letter.

3    (Felton Decl. Ex. E at HEALEY 000941.)  She provided no additional information about

4    the account.  (*Id.*)  DRS noted in its records it received the letter, that the account was in

5    dispute, and that it had requested verification documents.  (Collection Notes at DRS

6    0001.)

7        On July 5, 2007, DRS sent verification documents to Ms. Healey.  (*Id.*)  On July

8    23, 2007, DRS noted in its records that it had received new contact information for Ms.

9    Healey, and the next day, DRS sent copies of the verification documents to the new

10   address.  (*Id.*)  Ms. Healey did not receive either set of documents that DRS mailed in

11   July 2007.  (*See* Healey Decl. ¶ 4.)  Neither mailing is in the record before the court.

12       In January 2008, DRS noted in its records that Ms. Healey had not responded to its

13   July 2007 mailings.  (Collection Notes at DRS 0002.)  DRS reactivated Ms. Healey's

14   collection account, and on January 14, 2008, DRS sent Ms. Healey a second letter

15   demanding payment of the Sprint/Embarq debt.  (*Id.*; Felton Decl. Ex. F.)

16       On January 21, 2008, Ms. Healey sent another "Request for Debt Validation"

17   letter to DRS. (Felton Decl. Ex. G.)  The letter is nearly identical to Ms. Healey's March

18   2007 letter.  Ms. Healey stated that she had never had an Embarq account; noted that she

19   never received the validation documents she requested in March 2007; and asked DRS to

20   send her, within 30 days, the same four items listed in her March 2007 letter.  (*Id.*)  On

21   January 25, 2008, DRS again noted in its records that the account was in dispute.

22

ORDER - 4

1  (Collection Notes at DRS 0002.)  DRS's records reflect that it again sent the verification

2  documents to Ms. Healey.  (*Id.*)

3         On February 19, 2008, DRS noted in its records that it had received no response

4  from Ms. Healey regarding the verification documents, and it again reactivated Ms.

5  Healey's collection account.  (*Id.*)  On February 20, 2008, DRS sent a third letter to Ms.

6  Healey demanding payment.  (*Id.*; Felton Decl. Ex. H.)  The letter asked Ms. Healey

7  either to pay the debt or to contact DRS to discuss resolution of the debt.  (*Id.*)  In

8  addition, DRS, for the first time, reported Ms. Healey's delinquent account to the credit

9  reporting agencies.  (Schwartz Dep. at 27.)

10         On March 9, 2008, Ms. Healey sent a letter to DRS.  (Felton Decl. Ex. I.)  Ms.

11  Healey stated that she had received no response to her January 2008 request for

12  validation documents, and warned that she intended to file suit if DRS did not respond

13  within 15 days.  (*Id.*)

14         On March 18, 2008, DRS again mailed a response to Ms. Healey's request for

15  documents to verify the debt.  (Felton Decl. Ex. J; *see also* Collection Notes at DRS

16  0003.)  DRS's response included invoices and billing statements for a Sprint cellular

17  telephone account in the name of Wendy Healey at an address in Tallahassee, Florida.

18  (Felton Decl. Ex. J.)  DRS asked Ms. Healey to "remit payment immediately or call our

19  customer service department . . . if further information is required."  (*Id.* at HEALEY

20  000109.)

21         Although Ms. Healey received DRS's March 18, 2008 mailing, she did not contact

22  DRS or otherwise respond to the mailing.  (*See* Felton Decl. Ex. A ("Healey Dep.") at

1    277.)  Having received no response to the verification documents, DRS again reactivated

2    Ms. Healey's account, and, on May 7, 2008, sent Ms. Healey a fourth collection letter.

3    (Felton Decl. Ex. K; *see also* Collection Notes at DRS 0003.)  Ms. Healey did not

4    respond to the collection letter.  (Healey Dep. at 268.)

5         On June 12, 2008, DRS sent a fifth collection letter to Ms. Healey.  (Felton Decl.

6    Ex. L at HEALEY 000102.)  Again, Ms. Healey did not respond to DRS's letter.  (Healey

7    Dep. at 270.)

8         On July 21, 2008, DRS sent a sixth collection letter to Ms. Healey in which it

9    offered to settle the debt for 85% of the amount owed on the account.  (Felton Decl. Ex.

10   L at HEALEY 000099.)  The letter included the following language:

11                      A SETTLEMENT OFFER
                 YOU JUST CANNOT AFFORD TO PASS UP!!
12                   *** 15% OFF YOUR BILL ***

13         That is right – if you pay just $767.36 of the $902.77 that you currently
           owe, this account will be considered SETTLED IN FULL.  Upon clearance
14         of the funds we will notify the National Credit Reporting Agencies that this
           account has been settled.  To take advantage of this offer, your payment of
15         $767.36 must be received on or before 08/11/08.

16   (*Id.*)  Ms. Healey did not respond to the letter.  (Healey Dep. at 271.)

17        On August 28, 2008, DRS sent a seventh collection letter to Ms. Healey, again

18   offering to settle the debt for 85% of the amount owed.  (Felton Decl. Ex. L at HEALEY

19   000095.)  This letter included the following language:

20                   WE DON'T NEED A LOT OF WORDS
                       TO MAKE OUR POINT
21                  WE WANT YOUR PAYMENT – NOW

22

ORDER - 6

1      Even though you missed the deadline imposed by our recent settlement
       offer, we are still convinced that there has never been a better time to put an
2      end to this unpleasant situation.

3      Call it a good will gesture or just an honest attempt to clear this debt from
       an inventory of delinquent receivables that are still unpaid.  Whatever the
4      reason, our previous offer of settlement that had recently expired is now
       extended until 09/18/08.  If you accept this offer, you will save $135.41 and
5      begin the process of repairing your damaged credit reputation at the same
       time.
6
       Don't lose this opportunity.  Send us your check for $767.36 and upon
7      clearance of funds, your account will be considered settled and the
       appropriate Credit Reporting Agencies will be instructed to change the
8      status of this account.

9    (*Id.*)  Ms. Healey did not respond to the letter.  (Healey Dep. at 271.)

10          On October 10, 2008, DRS sent an eighth collection letter to Ms. Healey, this time

11   offering to settle the debt for 75% of the amount owed.  (Felton Decl. Ex. L at HEALEY

12   000091; *see also* Collection Notes at DRS 0004.)  This letter included the following

13   language:

14      Our last settlement offer was certainly most generous—but apparently we
       just didn't give you enough time to gather the funds before the offer
15      expired.  We also didn't suggest an alternative repayment program—a
       different way of finally paying down this debt.
16
       IN RESPONSE—
17      The first thing we will do is open the window of opportunity a little wider
       and extend our settlement offer until 10/31/08.  We are sure this additional
18      time will help you secure the funds required to settle this debt. And, using
       some creativity and recognizing the financial constraints that we all must
19      live under, we will accept the settlement amount in two (2) payments, each
       in the sum of $338.54.  The first check must be received by 10/31/08 and
20      the remaining check must be received by 11/31/08.

21   (*Id.*)  Ms. Healey did not respond to DRS's letter.  (Healey Dep. at 277.)

22

ORDER - 7

1    On October 20, 2008, DRS sent another copy of the Sprint/Embarq account

2    invoice to Ms. Healey.  (Felton Decl. Ex. M.)  Ms. Healey did not respond to this

3    mailing.  (Healey Dep. at 277.)

4    On November 21, 2008, when Ms. Healey applied for a loan to buy a new vehicle,

5    she learned that DRS's collection activity was appearing on her Experian credit report.

6    (Healey Decl. ¶ 16.)  Ms. Healey's credit union asked her to provide proof that the

7    Sprint/Embarq delinquency on her credit report was not hers before it would approve the

8    loan.  (*Id.*)  Although Ms. Healey felt humiliated and embarrassed, she provided the

9    requested proof and obtained an automobile loan that same day.  (Supp. Felton Decl.

10   (Dkt. # 64) Ex. A ("Healey Dep.") at 308-09.)  According to Nancy Bolling, the

11   mortgage lending administrator for Northwest Plus Credit Union, Ms. Healey qualified

12   for the best loan rates the credit union had available.  (Felton Decl. Ex. S ("Bolling

13   Dep.") at 18.)

14   On November 22, 2008, Ms. Healey sent a letter to DRS in which she stated that

15   the Sprint invoices that she received in March and October 2008 did not constitute proper

16   validation of the debt.  (Felton Decl. Ex. N.)  Her letter attached copies of two letters

17   purportedly written by a Federal Trade Commission attorney which, she contended,

18   proved that DRS's conduct was illegal.  (*Id.*)  Ms. Healey also sent letters to Trans Union

19   and Experian.  (Felton Decl. Exs. O, P.)  In these letters, Ms. Healey challenged the

20   improper reinsertion of the debt on her credit report and explained that she had removed

21   the Sprint/Embarq account from her report twice before.  (*Id.*)  Finally, Ms. Healey sent

22   letters to the attorneys general of Kansas, Georgia, Pennsylvania, Texas, and New York

1  to ask for help resolving the Sprint/Embarq account.  (Healey Decl. Ex. 22.)  Although

2  Ms. Healey's letter to the attorneys general contained a detailed chronology of her

3  attempts to resolve the Sprint/Embarq account, she did not include this information in her

4  letters to Trans Union, Experian, or DRS.  (*Compare id. with* Felton Decl. Exs. O, P.)

5         DRS received Ms. Healey's letter on November 28, 2008.  (Collection Notes at

6  DRS 0004.)  DRS again noted in its records that the account was in dispute, and set Ms.

7  Healey's account status to No Calls and Stop Mail.  (*Id.* at DRS 0004-0005.)  On January

8  8, 2009, DRS instructed the credit reporting agencies to delete the Sprint/Embarq account

9  from Ms. Healey's credit record.  (Collection Notes at DRS 0007.)

10        Ms. Healey's letter also triggered responses from Trans Union and Experian.  On

11 December 2, 2008, Trans Union sent Ms. Healey a letter in which it stated that the

12 disputed information did not appear on her credit report.  (Felton Decl. Ex. Q.)  Experian,

13 for its part, initiated a dispute investigation with DRS.  (Baxter Decl. (Dkt. # 60) Ex. 2

14 ("Hughes Dep.") at 92-93.)  On December 23, 2008, Ms. Healey obtained a copy of

15 Experian's investigation report.  (Healey Decl. ¶ 18 & Ex. 19.)  The first page of the

16 report noted that Experian had investigated the disputed DRS account and that the

17 account had been "verified as accurate."  (Healey Decl. Ex. 19 at 1.)  The report also

18 noted that Ms. Healey disputed the account, and that the account had been reported since

19 February 2008.  (*Id.* at 3.)

20        On January 12, 2009, Ms. Healey obtained a copy of a Credit Plus mortgage credit

21 when she and her husband attempted to refinance their home.  (Healey Decl. ¶ 21 & Ex.

22 21.)  The report, which summarizes credit scores across the three major credit reporting

1    agencies, includes the DRS collection account and notes that it is "disputed by

2    consumer."   (*Id.* at 3.)  None of Ms. Healey's Experian or Trans Union credit reports are

3    in the record before the court.

4         On February 2, 2009, Embarq sent a letter to the Washington State Attorney

5    General's Consumer Protection Division in which it stated that the disputed

6    Sprint/Embarq account had been opened using Ms. Healey's social security number and

7    date of birth.[3]  (Felton Decl. Ex. R.)

8         On July 10, 2009, Ms. Healey filed the instant lawsuit.  (Compl. (Dkt. # 1).)  In

9    her complaint, Ms. Healey alleges that DRS's conduct violated the Fair Debt Collection

10   Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, and the Fair Credit Reporting Act

11   ("FCRA"), 15 U.S.C. § 1681 *et seq*.  (Compl. ¶¶ 17-21, 30-38.)

12                        **II.    ANALYSIS**

13   **A.    Summary Judgment Standard**

14        Summary judgment is appropriate if the pleadings, the discovery and disclosure

15   materials on file, and any affidavits, when viewed in the light most favorable to the non-

16   moving party, "show that there is no genuine dispute as to any material fact and the

17   movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex*

18   *Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. County of Los Angeles*, 477 F.3d

19   652, 658 (9th Cir. 2007).  The moving party bears the initial burden of showing there is

20

21   _____

     [3] The letter states that it was sent in response to information mailed to Embarq on January
22   29, 2009.  (*Id.*) The January 29 mailing is not in the record, nor is there any evidence of how the
     Consumer Protection Division became involved in Ms. Healey's case.

1   no genuine issue of material fact and that he or she is entitled to prevail as a matter of

2   law. *Celotex*, 477 U.S. at 323. If the moving party meets his or her burden, the

3   nonmoving party must go beyond the pleadings and identify facts which show a genuine

4   issue for trial. *Cline v. Indus. Maint. Eng'g. & Contracting Co.*, 200 F.3d 1223, 1229

5   (9th Cir. 2000). The non-moving party "must make a showing sufficient to establish a

6   genuine dispute of material fact regarding the existence of the essential elements of his

7   case that he must prove at trial." *Galen*, 477 F.3d at 658.

8   **B.    FDCPA Claims**

9       "The purpose of the FDCPA is to protect vulnerable and unsophisticated debtors

10   from abuse, harassment, and deceptive collection practices." *Guerrero v. RJM*

11   *Acquisitions LLC*, 499 F.3d 926, 938 (9th Cir. 2007). Whether conduct violates the

12   FDCPA requires an objective analysis that takes into account the "the least sophisticated

13   debtor" standard. *See Donohue v. Quick Collect, Inc.*, 592 F.3d 1027, 1030 (9th Cir.

14   2010); *Guerrero*, 499 F.3d at 934. The FDCPA is a strict liability statute, which "should

15   be construed liberally in favor of the consumer." *Clark v. Capital Credit & Collection*

16   *Serv., Inc.*, 460 F.3d 1162, 1175-76 (9th Cir. 2006) (quotation omitted).

17       1.  <u>FDCPA Statute of Limitations</u>

18       DRS moves for summary judgment on Ms. Healey's claims based on collection

19   activities that occurred before July 10, 2008—that is, more than one year before Ms.

20   Healey filed her complaint.

21       Actions to enforce liability for violations of the FDCPA may be brought "within

22   one year from the date on which the violation occurs." 15 U.S.C. § 1692k(d); *see also*

1    *Naas v. Stolman*, 130 F.3d 892, 893 (9th Cir. 1997).  Ms. Healey concedes that her

2    FDCPA claims based on conduct that occurred before July 10, 2008 are barred by §

3    1692k(d).  (Resp. (Dkt. # 59) at 8-10; *see also id.* at 15 (conceding § 1692g claims).)

4    Therefore, the court grants DRS's motion for summary judgment on Ms. Healey's claims

5    for violations of the FDCPA based on DRS's collection activities before July 10, 2008.

6         2.  <u>§ 1692d Claim</u>

7         Section 1692d of the FDCPA prohibits a debt collector from engaging "in any

8    conduct the natural consequence of which is to harass, oppress, or abuse any person in

9    connection with the collection of a debt."  15 U.S.C. § 1692d.  In addition to this general

10   ban on harassing or abusive conduct, § 1692d provides a non-exclusive list of six

11   prohibited acts.  *Id.*  This list includes such actions as using or threatening violence or

12   other criminal means to harm the physical person, reputation, or property of any person;

13   using obscene, profane, or abusive language; publishing a list of consumers who

14   allegedly refuse to pay debts; advertising the debt for sale to coerce payment; repeatedly

15   or continuously calling a person with the intent to annoy, abuse, or harass any person;

16   and placing telephone calls without meaningful disclosure of the caller's identity.  *Id.*

17   Whether conduct violates § 1692d requires an objective analysis that considers whether

18   the "least sophisticated debtor" would find the conduct harassing, oppressive, or abusive.

19   *Guerrero*, 499 F.3d at 934.

20        DRS argues that it is entitled to summary judgment on Ms. Healey's § 1692d

21   claim because Ms. Healey cannot point to any evidence that DRS engaged in any

22   harassing, oppressive, or abusive conduct akin to the conduct prohibited by § 1692d.  Ms.

1    Healey counters that DRS violated § 1692d by sending her "harassing letters" demanding

2    payment of the Sprint/Embarq account.  (Resp. at 12.)

3         DRS sent only four letters to Ms. Healey after July 10, 2008.  (*See* Felton Decl.

4    Ex. L at HEALEY 000099, 000095, 000091; *id.* Ex. M.; Healey Decl. ¶¶ 12-15.)  Having

5    reviewed these letters in light of the "least sophisticated debtor" standard, the court

6    concludes that the letters do not constitute harassing, abusive, or oppressive conduct in

7    violation of § 1692d.  First, the July, August, and October 2008 collection letters used

8    polite, informative language, were sent at a rate of less than one per month, and offered to

9    settle the outstanding debt for less than the amount owed.  (*See* Felton Decl. Ex. L at

10   HEALEY 000099, 000095, 000091.)  Second, DRS's October 20, 2008 letter enclosing

11   the Sprint/Embarq billing statements states only that it encloses "documentation

12   supporting the current balance due" in response to Ms. Healey's request for verification

13   of the debt, and asks Ms. Heale either to "remit payment immediately" or to call

14   customer service "if further information is required."  (Felton Decl. Ex. M.)  Even the

15   "least sophisticated debtor" would not consider these letters harassing, abusive, or

16   oppressive.  *See Masuda v. Thomas Richards & Co.*, 759 F. Supp. 1456, 1465-66 (C.D.

17   Cal. 1991) (holding that the mailing of six letters per month did not violate § 1692d

18   because "[l]etters, so long as they comply with specific FDCPA requirements, represent

19   the least intrusive means of communicating with debtors.").

20

21

22

ORDER - 13

1        Ms. Healey characterizes the letters as harassing because they repeatedly asked her

2   to pay a debt that belonged to someone else.[4]  (*See, e.g.*, Healey Decl. ¶¶ 12-13.)  Ms.

3   Healey testified that she felt that DRS's March 2008 letter, which included the Sprint

4   billing statements, did not constitute adequate verification of the debt because it did not

5   include the full list of items that she requested in her January 2008 letter.  (Healey Dep. at

6   269.)  Thus, from Ms. Healey's perspective, DRS was continuing to try to collect a debt

7   that it had not proved to her was valid.  Although it is not unreasonable for Ms. Healey to

8   subjectively feel harassed when she continued to receive collection letters regarding an

9   account that she had twice removed from her credit report, this *subjective* feeling of

10  harassment is not actionable under the FDCPA.  Rather, FDCPA claims are governed by

11  an *objective* "least sophisticated debtor" standard that does not take into account the

12  unique circumstances of the individual debtor.  *See Guerrero*, 499 F.3d at 934.

13       Moreover, Ms. Healey's assertion that DRS harassed her by attempting to collect a

14  debt that belonged to a third party is based on a flawed understanding of the FDCPA's

15  verification requirements.  The Ninth Circuit has held that, "[a]t the minimum,

16  verification of a debt involves nothing more than the debt collector confirming in writing

17  that the amount being demanded is what the creditor is claiming."  *Clark*, 460 F.3d at

18  1173-74 (internal citation omitted).  In *Clark*, after the debtors requested verification of

19  _____

20       [4] The section of Ms. Healey's response addressing § 1692d is rife with exaggerations and
     misstatements of the record.  (*See* Resp. at 11-12.)  Contrary to Ms. Healey's assertions, a review
21   of Ms. Healey's letters to DRS reveals that she never "asked [DRS] to produce any proof that the
     account belonged to her and not another Wendy Healey," and she did not inform DRS until
     November 2008—after the allegedly "harassing" letters were sent—that she did not consider the
22   Sprint billing statements to be "proof that she was the one who opened the account."  (*Id.*)

1   the debt, the debt collector obtained information from the creditor "about the nature and

2   balance of the outstanding bill and provided the [debtors] with documentary evidence in

3   the form of the itemized statement." *Id.* at 1174.  The Ninth Circuit held that, by sending

4   the itemized statement to the debtors, the debt collector satisfied its verification

5   obligations under § 1692g.  *Id.*  The Ninth Circuit also noted that "the FDCPA did not

6   impose upon [the debt collector] any duty to investigate independently the claims

7   presented by" the creditor; and that, when verifying a debt, a debt collector generally may

8   "reasonably rely upon information provided by a creditor who has provided accurate

9   information in the past."  *Id.*  There is no requirement that the debt collector respond to a

10  timely request for validation within 30 days; rather, the debt collector must cease

11  collection activities until it mails the verification documents to the consumer.  Once the

12  debt collector obtains verification of the debt and mails a copy of the verification

13  documents to the consumer, it may resume its collection activities.  15 U.S.C. § 1692g(b).

14      Here, in response to Ms. Healey's request for verification of the debt, DRS mailed

15  Ms. Healey a copy of the itemized billing statement on the Sprint/Embarq account that

16  demonstrated the amount of the outstanding bill and showed that the debt was in the

17  name of Wendy Healey.  Thus, the undisputed facts establish that DRS satisfied its

18  obligation to verify the debt under the FDCPA.  When Ms. Healey did not respond to

19  DRS's correspondence, DRS was entitled to resume collection activity.  15 U.S.C. §

20  1692g(b).  DRS's conduct in resuming that activity, therefore, was lawful and was not

21  harassing, abusive, or oppressive in violation of § 1692d.

22

3.  § 1692e Claims

DRS moves for summary judgment on Ms. Healey's claims under § 1692e, which prohibits the use of "false, deceptive, or misleading representation[s] or means in connection with the collection of any debt."  15 U.S.C. § 1692e.  Although Ms. Healey concedes that summary judgment is appropriate on her claims that DRS violated § 1692e by "falsely representing the compensation it could receive, and failing to communicate that the debt was disputed" (Resp. at 12 n.3), Ms. Healey continues to assert claims that DRS falsely represented the "character, amount, or legal status" of her debt in violation of § 1692e(2)(A), and "[c]ommunicat[ed] or threaten[ed] to communicate to any person credit information which is known or which should be known to be false" in violation of § 1692e(8).

a.      § 1692e(2)(A) Claim

The FDCPA prohibits a debt collector from making a false, deceptive, or misleading representation about "the character, amount, or legal status of any debt."  15 U.S.C. § 1692e(2)(A).  The plaintiff is not required to prove that the defendant knowingly or intentionally made the false representation.  *Clark*, 460 F.3d at 1176.  A debt collector is not liable for a false representation, however, if "the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error."  15 U.S.C. § 1692k(c).  Thus, "if a debt collector reasonably relies on the debt reported by the creditor, the debt collector will not be liable for any errors."  *Clark*, 460 F.3d at 1177.  Because the bona fide error defense is an affirmative defense, the debt collector bears the burden of proof.  *Id.*

1        Viewing the evidence in the light most favorable to Ms. Healey, and mindful that

2   the FDCPA does not require proof that a violation of § 1692e(2)(A) was knowing or

3   intentional, the court concludes that Ms. Healey has met her burden to establish a genuine

4   issue of material fact regarding whether DRS made a false representation about "the

5   character, amount, or legal status" of the debt when it represented in its collection letters

6   and to the credit reporting agencies that the delinquent Sprint/Embarq account belonged

7   to her.

8        DRS argues that Ms. Healey cannot prove her § 1692e(2) claim because the

9   FDCPA does not impose on a debt collector any duty to independently investigate the

10  debt or the debtor.  (Reply (Dkt. # 63) at 5 (citing *Clark*, 460 F.3d at 1174).)  Although

11  DRS is correct, this rule applies to violations of § 1692g, not violations of § 1692e.  *See*

12  *Clark*, 460 F.3d at 1174.[5]  As the Ninth Circuit noted in *Clark*, the court's determination

13  that the debt collector's verification of the debt did not violate the FDCPA was not the

14

_____

15        [5] To support its contention that it is entitled to summary judgment on Ms. Healey's §
16  1692e claims, DRS relies in its reply brief—and relied at oral argument—on *Becker v. Genesis
    Financial Services*, No. CV-06-5037-EFS, 2007 WL 4190473 (E.D. Wash. Nov. 21, 2007).
17  Having reviewed *Becker*, the court respectfully declines to follow it because *Becker* did not
    apply the correct standard to the § 1692e claims.  The *Becker* court based its analysis on *Bleich v.
    Revenue Maximization Group, Inc.*, 233 F. Supp. 2d 496, 500-01 (E.D.N.Y. 2002).  *See Becker*,
18  2007 WL 4190473, at *7-8.  In 2006, however, the Ninth Circuit disapproved the standard the
    *Bleich* court applied to § 1692e claims.  *Clark*, 406 F.3d at 1175.  Although the *Clark* court
19  agreed with *Bleich* that a debt collector may reasonably rely on its client's statements when
    verifying a debt pursuant to § 1692g, *see id.* at 1174, the court expressly disagreed with *Bleich*'s
20  conclusion that a plaintiff must show that the debt collector knowingly or intentionally
    misrepresented the debt in order to prevail under § 1692e, *see id.* at 1175 (citing *Bleich*, 233 F.
21  Supp. 2d at 500-01).  In addition, the *Becker* court improperly applied *Clark*'s § 1692g standard
    to the plaintiff's § 1692e(2) claim.  *Becker*, 2007 WL 4190473, at *9 (citing *Clark*, 406 F.3d at
22  1174).  For these reasons, the court finds neither *Becker* nor *Bleich* persuasive in analyzing Ms.
    Healey's § 1692e claims.

1   end of the court's inquiry into the plaintiffs' claims.  *Id.*  Rather, the court continued on to

2   analyze the plaintiffs' claim that the debt collectors knew that the debt alleged by the

3   creditor was "invalid and misstated" in violation of § 1692e(2)(A).  *Id.*  The Ninth Circuit

4   held that a debt collector's conduct need not be knowing or intentional to violate § 1692e.

5   *Id.* at 1176.  The court recognized, however, that there is a "narrow exception to strict

6   liability" under the FDCPA where "the violation was not intentional and resulted from a

7   bona fide error notwithstanding the maintenance of procedures reasonably adapted to

8   avoid any such error."  *Id.*; 15 U.S.C. § 1692k(c).

9       Here, Ms. Healey has presented evidence that DRS falsely represented in its

10  collection letters and its communications to the credit agencies that she was responsible

11  for the delinquent Sprint/Embarq account.  In light of the FDCPA's strict liability

12  standard, this evidence is sufficient to establish a genuine issue of material fact regarding

13  whether DRS violated § 1692e(2)(A).  Further, because DRS has pointed the court to no

14  evidence that its reliance on Sprint/Embarq's representations regarding Ms. Healey's

15  account was reasonable or that it maintained procedures to avoid errors, it has failed to

16  establish that it is entitled on summary judgment to the bona fide error affirmative

17  defense.  *See Clark*, 460 F.3d at 1177.  The court therefore DENIES DRS's motion for

18  summary judgment on Ms. Healey's claim for violation of 1692e(2)(A).

19          *b.      § 1692e(8) Claim*

20      The FDCPA prohibits "communicating or threatening to communicate . . . credit

21  information which is known or which should be known to be false, including the failure

22  to communicate that a disputed debt is disputed."  15 U.S.C. § 1692e(8).  The language

1    of § 1692e(8), unlike the language of § 1692e(2), requires the plaintiff to show that the

2    defendant knew or should have known that the information was false.  *Id.; see also Clark,*

3    460 F.3d at 1176 n.11 (noting that although the FDCPA is generally a strict liability

4    statute, Congress expressly required elements of knowledge and intent where it deemed

5    them necessary).  Here, Ms. Healey has offered no evidence that DRS knew or should

6    have known that the debt it purchased from Sprint/Embarq was invalid.  Rather, DRS

7    requested and received documents verifying the debt from Sprint/Embarq; DRS sent

8    those documents to Ms. Healey; and DRS resumed its collection activities only after Ms.

9    Healey failed to respond in any way to its mailing.  Ms. Healey's letters to DRS stated

10   only that the account was not hers: they did not explain that Ms. Healey had been the

11   victim of identity fraud, did not state that she had twice removed the account from her

12   credit report, and did not, until November 2008, put DRS on notice that she considered

13   the Sprint/Embarq billing statements to be insufficient verification of the debt.[6]  Finally,

14   Ms. Healey concedes that summary judgment is appropriate on her claim that DRS failed

15   to report that the debt was disputed.  Because Ms. Healey has not offered evidence

16   demonstrating a genuine issue of material fact regarding whether DRS communicated

17

18   _____

19

20        [6] At oral argument, counsel for Ms. Healey pointed out that DRS knew that the
     Sprint/Embarq account had likely been assigned to other agencies in the past.  (*See* Schwartz
     Dep. at 22 ("I am aware that it's the normal practice of Sprint/Embarq to assign to multiple
21   agencies, yes, prior to us obtaining it.  I don't know who they assigned it to.").)  Counsel,
     however, has directed the court to no authority for the proposition that knowledge that
     Sprint/Embarq may have assigned the account to other collection agencies should have put DRS
22   on notice that the account did not belong to Ms. Healey.

ORDER - 19

1    credit information which it knew or should have known was false, the court grants DRS's

2    motion for summary judgment on Ms. Healey's claim under § 1692e(8).

3         4.   § 1692f Claims

4         Section 1692f of the FDCPA prohibits a debt collector from using "unfair or

5    unconscionable means to collect or attempt to collect any debt."  15 U.S.C. § 1692f.

6    Whether conduct violates § 1692f requires an objective analysis that takes into account

7    the "the least sophisticated debtor" standard.  *See Donohue*, 592 F.3d at 1030.

8         DRS moves for summary judgment on all of Ms. Healey's claims under § 1692f.

9    In her response, Ms. Healey concedes several of her claims, but argues that summary

10   judgment is inappropriate on her claim for violation of § 1692f(1), which prohibits "[t]he

11   collection of any amount (including any interest, fee, charge, or expense incidental to the

12   principal obligation) unless such amount is expressly authorized by the agreement

13   creating the debt or permitted by law."  (Resp. at 14.)  Ms. Healey contends that the

14   amount DRS tried to collect was not authorized by law or agreement because (1) DRS

15   acknowledged there was no underlying agreement signed by the original debtor; (2) DRS

16   should have known that the account did not belong to Ms. Healey.

17        The court concludes, viewing the evidence in the light most favorable to Ms.

18   Healey, that DRS did not use unfair or unconscionable means of collecting the debt.  Ms.

19   Healey's argument that the debt was not authorized by law or agreement is unavailing.

20   Contrary to Ms. Healey's assertions, DRS did not concede that there was no underlying

21   contract.  (*See* Supp. Schwartz Dep. (Dkt. # 69) at 38 (stating that there are no signed

22   contracts for landline telephone accounts and that the fact that there is no signature does

ORDER - 20

1   not mean there was not a contract).)  In addition, Ms. Healey has offered the court no

2   evidence that DRS should have known the account did not belong to Ms. Healey.

3   Although Ms. Healey's letters stated that the account was not hers, she did not inform

4   DRS that she had been a victim of identity theft or that she had successfully removed the

5   account from her credit report twice in the past.  Rather, Ms. Healey stated only that she

6   had never had an Embarq account, and DRS appropriately responded by mailing her the

7   billing statements for the Sprint/Embarq account that had been opened under her name.

8            To the extent Ms. Healey challenges DRS's other actions or communications,

9   those claims, too, are unavailing.  The letters DRS sent to Ms. Healey were informational

10   and nonthreatening.  *See Wade v. Regional Credit Ass'n*, 87 F.3d 1098, 1100-01 (9th Cir.

11   1996).  In addition, as noted above, the letters were relatively infrequent:  DRS sent only

12   four between July 2008 and October 2008.  Similarly, the court is not persuaded by Ms.

13   Healey's assertion that DRS's "refusal to investigate" was unfair or unconscionable.

14   DRS sought verification documents and delivered them to Ms. Healey upon request in

15   compliance with § 1692g.  Because Ms. Healey did not respond to DRS's mailings, DRS

16   had no reason to investigate further.  None of DRS's conduct rises to the level of the

17   "unfair or unconscionable" conduct listed in § 1692f.  The court therefore concludes,

18   viewing the evidence in the light most favorable to Ms. Healey, that summary judgment

19   is appropriate on Ms. Healey's § 1692f claims.

20

21

22

ORDER - 21

1    5.  <u>FDCPA Damages</u>

2    The FDCPA provides that:

3    any debt collector who fails to comply with any provision of this
     subchapter with respect to any person is liable to such person in an amount
4    equal to the sum of—

5    (1) any actual damage sustained by such person as a result of such failure;

6    (2)(A) in the case of any action by an individual, such additional damages
     as the court may allow, but not exceeding $1,000; . . .

7
     (3) . . . the costs of the action, together with a reasonable attorney's fee as
8    determined by the court.

9    15 U.S.C. § 1692k(a).  In determining the amount of additional damages under §

10   1692k(2)(A), the court "shall consider . . . the frequency and persistence of

11   noncompliance by the debt collector, the nature of such noncompliance, and the extent to

12   which such noncompliance was intentional[.]."  15 U.S.C. § 1692k(b)(1).  As noted

13   above, the FDCPA provides an affirmative defense under which the debt collector cannot

14   be held liable for a violation of the statute if it shows "by a preponderance of the

15   evidence that the violation was not intentional and resulted from a bona fide error

16   notwithstanding the maintenance of procedures reasonably adapted to avoid any such

17   error."  15 U.S.C. § 1692k(c).

18       DRS seeks a determination on summary judgment that Ms. Healey cannot

19   establish any actual damages resulting from any violations of the FDCPA.  Ms. Healey

20   concedes that she cannot recover damages based on her assertions that DRS's violations

21   of the FDCPA resulted in a reduced line of credit and an increased homeowner's

22   insurance premium.  (Resp. at 17.)  Ms. Healey contends, however, that she is entitled to

1    actual damages because the initial denial of her application for a loan to buy a new

2    vehicle was "extremely upsetting and very humiliating and embarrassing."  (*Id.*)

3           The Ninth Circuit has not ruled on whether emotional distress damages are

4    recoverable under the FDCPA, and the district courts are split on the issue.  *See Riley v.*

5    *Giguiere*, 631 F. Supp. 2d 1295, 1315 (E.D. Cal. 2009) (citing cases).  In *Riley*, the court

6    concluded that emotional damages are available for violations of the FDCPA.  The *Riley*

7    court observed that the FDCPA's damages provision is "virtually identical to that of the

8    FCRA," and that the "Ninth Circuit has held that 'actual damages' under the FCRA

9    includes recovery for 'emotional distress and humiliation.'"  *Id.* (quoting *Guimond v.*

10   *Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995)).  The *Riley* court

11   therefore concluded that a plaintiff may recover emotional distress damages for violations

12   of the FDCPA provided she shows that she actually suffered symptoms of emotional

13   distress.  *Id.*

14          The court is persuaded by the *Riley* court's analysis, and, like *Riley*, holds that

15   "actual damages" under the FDCPA includes emotional distress damages.  Although Ms.

16   Healey admits that she did not seek psychological or medical treatment for her emotional

17   distress (*see* Healey Dep. at 218), this is not dispositive.  *See Riley*, 631 F. Supp. 2d at

18   1315 (holding that a plaintiff need not prove the elements of a claim for emotional

19   distress under state tort law order to recover emotional distress damages under the

20   FDCPA).  Therefore, the court denies DRS's motion for a determination on summary

21   judgment that Ms. Healey cannot prove actual damages under the FDCPA.

22

1  **C.   FCRA Claim**

2        "Congress enacted the [FCRA] in 1970 'to ensure fair and accurate credit

3  reporting, promote efficiency in the banking system, and protect consumer privacy.'"

4  *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1153 (9th Cir. 2009) (quoting

5  *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007)).  Section 1681s-2 of the FCRA

6  imposes two responsibilities on sources that provide credit information to credit reporting

7  agencies ("CRAs").  These sources, including debt collectors, are called "furnishers"

8  under the statute.  First, a furnisher must provide accurate information.  15 U.S.C.

9  § 1681s-2(a).  Second, a furnisher must investigate and/or correct inaccurate information.

10  15 U.S.C. § 1681s-2(b).  These duties are triggered only "'upon notice of dispute' – that

11  is, when a person who furnished information to a CRA receives notice from the CRA that

12  the consumer disputes the information."  *Gorman*, 584 F.3d at 1154.  "[N]otice of a

13  dispute received directly from the consumer does not trigger furnishers' duties under

14  subsection (b)."  *Id*.

15        Section 1681s-2(b) provides that, after receiving a notice of dispute, the furnisher

16  shall:

17        (A) conduct an investigation with respect to the disputed information;

18        (B) review all relevant information provided by the [CRA] pursuant to
       section 1681i(a)(2) . . .;

19
       (C) report the results of the investigation to the [CRA];

20
       (D) if the investigation finds that the information is incomplete or

21     inaccurate, report those results to all other [CRAs] to which the person
       furnished the information . . .; and

22

(E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1) . . . (i) modify . . . (ii) delete . . . [or] (iii) permanently block the reporting of that item of information [to the CRAs].

15 U.S.C. § 1681s-2(b).  "The FCRA expressly creates a private right of action for willful or negligent noncompliance with its requirements."  *Gorman*, 584 F.3d at 1154.  This right of action, however, is limited to claims arising under § 1681s-2(b).  *Id.*  "A private litigant can bring a lawsuit to enforce § 1681s-2(b), but only after reporting the dispute to a CRA, which in turn reports it to the furnisher.  *Nelson v. Chase Manhattan Mortgage Corp.,* 282 F.3d 1057, 1059-60 (9th Cir. 2002).  Duties imposed under § 1681s-2(a), by contrast, are enforceable only by federal or state agencies.  15 U.S.C. § 1681s-2(d).

A furnisher's investigation of a dispute pursuant to § 1681s-2(b)(1)(A) must be reasonable.  *Gorman*, 584 F.3d at 1157.  The burden of showing the investigation was unreasonable is on the plaintiff.  *See id.*  The furnisher's duty to conduct a reasonable investigation arises when it receives a notice of dispute from a CRA.  *Id.*  "Such notice must include 'all relevant information regarding the dispute that the [CRA] has received from the consumer."  15 U.S.C. § 1681i(a)(2)(A).  Thus, "the pertinent question is  . . . whether the furnisher's procedures were reasonable in light of what it learned about the nature of the dispute from the description in the CRA's notice of dispute."  *Gorman*, 584 F.3d at 1157 (citing *Westra v. Credit Control of Pinellas*, 409 F.3d 825, 827 (7th Cir. 2005) (holding that the furnisher's investigation in that case was reasonable given the "scant information" it received from the CRA regarding the nature of the consumer's dispute)).  Although reasonableness is normally a question for the finder of fact,

1    summary judgment is appropriate "when only one conclusion about the conduct's

2    reasonableness is possible." *Id.* at 1157.

3          DRS contends that summary judgment is appropriate on Ms. Healey's FCRA

4    claim because she did not notify the CRAs of any dispute with DRS until November 22,

5    2008, and she has no evidence that DRS negligently or willfully failed to comply with

6    any FCRA requirements thereafter.  Ms. Healey focuses on Experian in her response.

7    Ms. Healey asserts that she notified Experian that she disputed the accuracy of DRS's

8    information; that Experian notified DRS of the dispute by sending it an Automated

9    Consumer Dispute Verification ("ACDV") form; and that DRS verified that the

10   information reported on her Experian credit report was accurate.[7]  (Resp. at 15-16 (citing

11   Hughes Dep. at 92-93).)

12         The court concludes that Ms. Healey has not met her burden to "make a showing

13   sufficient to establish a genuine dispute of material fact regarding the existence of the

14   essential elements of [her] case that [she] must prove at trial."  *Galen*, 477 F.3d at 658.

15   First, with respect to Trans Union, the only evidence in the record is Trans Union's

16   December 2, 2008 letter to Ms. Healey in which it stated that the disputed DRS account

17   did not appear on Ms. Healey's Trans Union credit report.  (Felton Decl. Ex. Q.)  Ms.

18   Healey has offered the court no evidence that Trans Union reported any dispute to DRS

19   as required to trigger DRS's duties under the FCRA. Thus, summary judgment is

20

21   _____

22         [7] Contrary to Ms. Healey's assertion (Resp. at 16), DRS does not deny that it received
     notice of a dispute from Experian.

1  appropriate to the extent Ms. Healey brings FCRA claims against DRS arising out of a

2  dispute notice received from Trans Union.

3        Nor does the evidence before the court support a conclusion that DRS conducted

4  an unreasonable investigation following receipt of a dispute notice from Experian.

5  Experian's Rule 30(b)(6) deponent, Kim Hughes, testified that after Experian received

6  Ms. Healey's letter in November 2008, it initiated a dispute with DRS and "conveyed the

7  information that Ms. Healey stated about the account to appear also on the dispute

8  verification form that was transmitted to [DRS]." (Hughes Dep. at 92-93.)  Although the

9  ACDV form that Experian transmitted to DRS is not in the record before the court, the

10  Ms. Hughes testified that Experian coded the dispute as "claims inaccurate information."

11  (*Id.* at 94.)  In December 2008, Experian received verification from DRS that the

12  information it had reported about the Sprint/Embarq account was accurate.  (*Id.* at 110-

13  11.)  Experian then prepared a report for Ms. Healey in which it summarized the results

14  of its investigation.  (*Id.* at 111; Healey Decl. Ex. 19.)  The report, dated December 23,

15  2008, shows that Experian "completed investigating the items you disputed with the

16  sources of the information" and notes that the DRS item "remains" on the account

17  because it had been verified as accurate.  (Healey Decl. Ex. 19 at 2.)  The report lists the

18  DRS collection account as a "potentially negative item[] or item[] for further review,"

19  and notes that it was disputed by the consumer.  (*Id.* at 4.)  The record does not contain

20  any evidence regarding the investigation DRS performed following its receipt of the

21  ACDV form.

22

1    This evidence is insufficient to survive summary judgment.  In *Gorman*, the

2  notices sent by the CRAs to the furnisher were in the record, as were the furnisher's notes

3  regarding the inquiries it made after receiving the notices.  *Gorman*, 584 F.3d at 1157-61.

4  The court, therefore, was able to evaluate both the notices and the furnisher's response in

5  determining whether the furnisher's investigation was reasonable in light of the

6  information provided by the CRAs.  *Id.*  Similarly, in *Westra*, the Seventh Circuit

7  concluded that a furnisher's investigation was reasonable where the CRA's notice stated

8  only that consumer was disputing the charge on the basis that the account did not belong

9  to him, and did not provide any information about possible fraud or identity theft.

10  *Westra*, 409 F.3d at 827.  Under these circumstances, the furnisher satisfied its

11  obligations when it verified the consumer's name, address, and date of birth to the CRA.

12  *Id.*

13    Here, by contrast, neither the CRAs' dispute notices nor evidence of DRS's

14  investigation are before the court.  The court thus is left to speculate regarding the

15  reasonableness of DRS's investigation in light of the information provided by the CRA.

16  To survive summary judgment, it is not enough that DRS's conclusion regarding the

17  validity of the Sprint/Embarq account ultimately proved to be incorrect.  As the Ninth

18  Circuit has made clear, "[a]n investigation is not necessarily unreasonable because it

19  results in a substantive conclusion unfavorable to the consumer, even if that conclusion

20  turns out to be inaccurate."  *Gorman*, 584 F.3d at 1161.  Therefore, in light of the absence

21  in the record of evidence of the CRAs' dispute notices or DRS's investigation in response

22  to those notices, the court concludes that Ms. Healey has not met her burden to establish a

ORDER - 28

1 genuine issue of material fact regarding whether DRS violated the FCRA by failing to

2 complete a reasonable investigation.

3        In addition, to the extent Ms. Healey alleges that DRS violated the FCRA by

4 failing to notify the CRAs that her account was in dispute, this claim also fails.  A

5 furnisher's failure, after receiving notice of a dispute from a CRA, to report a "bona fide

6 dispute . . . that could materially alter how the reported debt is understood . . . gives rise

7 to a furnisher's liability under § 1681s-2(b)."  *Gorman*, 584 F.3d at 1163 (holding that

8 consumer could bring a claim against the furnisher for failing to report to the CRAs that a

9 charge was still disputed following investigation).  Here, the only evidence in the record

10 is that DRS accurately reported to Experian that Ms. Healey disputed the validity of the

11 Sprint/Embarq account.  (Healey Decl. Ex. 19 at 4.)  Summary judgment, therefore, is

12 appropriate on this claim as well.

13                        **III.    CONCLUSION**

14        For the foregoing reasons, the court GRANTS in part and DENIES in part DRS's

15 motion for summary judgment (Dkt. # 55).

16        Dated this 18th day of May, 2011.

17

18                                        _____

19                                        JAMES L. ROBART
                                          United States District Judge

20

21

22

ORDER - 29